St. Louis Southwestern Railway Co. *v.* Hopkins.

4-5126

Opinion delivered June 27, 1938.

658

*A. H. Kiskaddon, Carleton S. Hadley* and *Gaughan, Sifford, Godwin & Gaughan,* for appellants.

*Robert W. Launius* and *L. B. Smead,* for appellee.

GRIFFIN SMITH, C. J. Appellee's allegations are that negligent operation of one of appellants' passenger trains was the proximate cause of injuries he sustained from which total and permanent disability resulted. Judgment was rendered for $35,000.

A summary of the injuries is: "Health of the plaintiff has been greatly impaired, and his nervous system has been damaged and impaired; all of his injuries are permanent and progressive and will continually grow worse. On account of his said injuries the plaintiff suffered severe physical pain and mental anguish, and will continue to suffer for the balance of his lifetime."

Appellee, an employee of a Pine Bluff baking company, was injured while operating a bread truck on a highway that traverses appellants' railway at Roth's crossing, about two and a half miles from Stuttgart. He alleges that as he approached the crossing his vision was obstructed by a deep railway cut, and by weeds and shrubbery along the cut; that it was raining, and the weather was cold and foggy; it was impossible for him to observe the train as it approached from a southerly direction; before proceeding to cross the track he stopped, looked, and listened; the whistle was not being sounded

nor the bell rung, and he had no other warning of the proximity of danger.

Appellee's witnesses testified: (1) "I was driving north, or in the opposite direction to the way plaintiff was driving. I saw the train coming. It was two or three hundred yards from the crossing when I saw it. We crossed in front of the train, and about one hundred yards on the side toward Stuttgart we met this bread truck driven by Hopkins. I did not hear the engine whistle or the bell ring. . . . The engine could have whistled and probably did, but I did not hear it. The windows of my truck were closed. It was a rainy, foggy morning."

(2) "In going from Stuttgart you go west into a ravine—that is, a low part of the road. The railroad comes through a cut, which cut is on the left-hand side as you go west. It is a very deep cut and is extremely rough, with weeds and vegetation on both sides of the track. It has always been bad. . . . When you leave the cemetery you can see the train approaching the crossing, but when you get to the cut you have to stop to see it. The cemetery is on a hill and is a little more than a quarter of a mile from the track. The highway dips a little at the cut where the track is located. The cut about which I testified is about a quarter of a mile from where the highway crosses the track. You have to get almost to the track before you can see a train approaching from the south. The embankment on the right-of-way of the railroad runs right up to the highway right-of-way. The embankment has always been covered with a lot of brush and bushes. The grass and bushes grow four or five feet high. It is a prairie country through there and the grass is pretty high. The bushes I testified about are on the railroad company's right-of-way."

On cross-examination witness No. 2 said: "It is down grade from the cemetery to the crossing. If you look to the left you can see a train coming from the south a quarter of a mile from the crossing." Shown a photograph, the witness said: "I believe this is a photograph of the crossing, but it doesn't look natural

[but] the camera would not show things that I could not see. The picture looks too clear for me. There are corn, rice, and green fields at this time, but there was no such condition on February 27, 1937. . . . I cannot explain the difference, but there is a difference in the picture of the highway and its actual condition. I know the photographer, Raymond Downing, and I don't think he would fix up the picture. My impression of the condition about the crossing is different from the picture. I have never measured the cut where the railroad track is located. I have never walked down in the cut, but looked at it from the highway. I have noticed the big railroad sign at the crossing and also two small signs sitting back on the highway which were put up by the highway department. They have signal lights—reflectors—on them. I never stopped when I would be going across the crossing, but would slow down and look for trains. . . . The foliage would be worse now [October, 1937] than then. If the engineer in his cab can see cars approaching the crossing, then a man in a car should see the train without any trouble. . . . The highway has been regraded and regraveled since February 27, 1937, and is a good deal higher now than it was then. I do not see any bushes reflected by the picture. . . . I could not see the train as it came through the cut, but noticed it when I was on cemetery hill. . . . I could not see the train because the cut was too deep. There would be no trouble in seeing it, however, at a distance of 310 feet.''

(3) ''I have crossed that crossing every two weeks for six years. The dump is around six feet high and there were weeds and sprouts on it. This condition exists up to fifteen or twenty feet off the highway. You cannot see a train from Pine Bluff approaching the crossing until you get close to the highway. . . . There is a low place after you leave the cemetery that you cannot see the train until you climb the other slope. . . . The conditions of the surroundings of the crossing and the highway were the same on Wednesday following the accident which occurred on the previous Saturday. . . . There is no place after you pass the

cemetery that you can see a train approaching from Pine Bluff until you reach the crossing. . . . There is a bend in the railroad track at the crossing—a mile and a half south of the crossing. . . . The foliage was dead on February 27. Ninety per cent. of the time I stop at that crossing; sometimes I take a chance like the other fellows. . . . I never measured the dump, but estimate it at six or eight feet high. . . . These bushes shown in the picture were there at the time Mr. Hopkins was hurt, and there were leaves on the bushes, although they were dead. . . . You could see the train when you got within fifteen or twenty feet of the track. . . . It is a cut through a knoll, the length of two telephone poles. Before the train gets to the knoll you can see the train clear back to the cemetery [but] there is a low place in the highway before you get to the crossing.''

(4) [Engineer called by plaintiff.] ''I operated the engine the day Bert Hopkins was injured. Our train consisted of an engine, one car and a caboose. . . . The engine had 57-inch drivers; it was a 450-class or type [and is] 14 feet and seven inches from the rail to top of cab. The 600-class engine is fifteen feet and two inches. The engine in the photograph shown me is a 700-class engine and is 15 feet and three inches. . . . The railroad south of the crossing is straight and level for about three and a half miles. The engine was working some steam as we came up to the crossing. When we reached the whistling post a quarter of a mile south I whistled two longs, a short, and a long and an extra short. The bell was being rung as we approached the crossing. . . . As I approached the crossing I saw three cars coming down the highway. I cannot tell how far they were apart, but one of them crossed too close ahead of us. . . . The bread truck was right behind it. I had every reason in the world to believe the boy would stop—the whistle was wide open. . . . When he did not stop I put the brakes in emergency and held the whistle open. . . . I saw the bread truck a good way from the crossing; it was painted awfully bright, and I could see him hundreds of yards. At the time the

first truck went by the driver of the bread truck had plenty of time to stop before I got to the crossing with the train. People on these highway crossings sometimes drive up to the crossing and stop the automobile—it is almost an every day occurrence in running a locomotive to see some one take a desperate chance and drive right up to the crossing. Sometimes they get so close it doesn't look like it would clear. When I saw the bread truck approaching I expected him to stop and not go up on the track. He had a quarter of a mile in which to stop. I could see him all the way as he approached the crossing.''

(5) ''We were driving about 150 yards behind Bert Hopkins. I never heard the whistle blow or bell ring. I saw the train about 70 or 80 feet before it struck him. The accident occurred about 10:30 in the morning. The plaintiff passed me running probably 35 miles an hour. He passed me about 300 yards before we reached the crossing. . . . The rail crossing looks different from the photograph. You have no trouble seeing the train in the picture. . . . I cannot say that you could not see a train, but I never saw one [referring to the photograph] like that one.''

(6) ''We were driving toward Stuttgart. When we crossed the railroad I could see the train about 300 feet down the track. After we crossed we met Mr. Hopkins about 100 yards or a little more, from the crossing, going in the opposite direction. As I approached the crossing and after I had crossed over I never heard the whistle blow or the bell ring. . . . I do not know whether the engine had reached the whistling post before I crossed the crossing, or not. . . . We were running 35 or 40 miles an hour and neither stopped nor slowed up as we went over the crossing. . . . [but] we had plenty of time to make it and we took the chance. The plaintiff took the same chance that we did, but it was a pretty bad one, the way he is crippled up. I don't say the whistle did not sound or the bell ring—I just said I didn't hear it.''

(7) "I was going from Stuttgart in the same direction Hopkins was driving. When I crossed I could see the train coming up the track 300 or 400 yards. I drove about 125 yards when I heard the crash. I turned around and went back, but they had already laid the man on the train. I had crossed the track before Hopkins got there. I never heard the bell ring or the whistle blow, and my hearing is good. . . . I was driving around twenty miles an hour. . . . I may have slowed up—I don't remember—but I didn't stop at the crossing."

(8) "It is a very dangerous crossing. On the east side of the right-of-way of the railroad is a very high dump or cut—a kind of cutaway, and grown up with weeds and stuff. The weeds at that time were pretty high, ranging in height from three and a half to five feet. This condition exists for more than 100 yards along the right-of-way. I have driven right up on the crossing two or three times before I could see a train. I could not see a train unless it was a very long one. The cut through which the tracks run comes right up to the highway. . . . I crossed at that place sometimes twice a day for as many as three days a week, and had done so for six months."

The appellee testified: "I am 30 years old. At the time I was injured I was driving a truck delivering bread, and visited Stuttgart in that territory regularly. . . . About the fifteenth of January [1931] I took over the Stuttgart route and made that territory every other day. . . . I left Stuttgart the morning of February 27, 1937, around ten o'clock, and it was a misty day, not raining hard. . . . The first place on the route from Stuttgart to the Roth crossing that you can see the railroad is the cemetery. At the cemetery I looked across the field both ways and saw no train. I was driving 30 or 40 miles an hour. When I drove up to the track I slowed down and didn't see any train in sight anywhere, and I continued up until about fifteen feet from the track and stopped. I didn't see or hear a train in sight. I started across the track. The road being bad, I was running in second gear. When I got within a few feet

of the track then the train came out of the cut. I swung the truck to the right and was hit. . . . I had looked and listened for the train both ways all the time until I was struck. At the time I slowed down, about fifty yards from the track, I went into low gear. After I stopped within fifteen feet of the track I started up in low gear and had shifted to second gear before I saw the train. The train was not visible to me until just prior to the time it struck me. No whistle was blown or bell rung as I approached the crossing. . . . I am thoroughly familiar with the location of the highway where the tracks cross it. . . . I was driving 25 or 30 miles an hour. I passed another car; I don't know how fast his car was running, but not very fast. It seems like there was another car going in the same direction in front of me. . . . The train on that occasion was running 25 or 30 miles an hour. . . . I suppose that if the train was running as fast as I was it would be the same distance from the crossing that I would be. I did not see the train because it was hid. . . . Being fifteen feet from the railroad, I could not see very far down the track; neither could I see very far to my right because of a house. When I stopped I could see down the track only fifteen feet—fifteen or twenty feet. Maybe you could see 30 or 40 feet.''

Dr. S. A. Drennan testified: ''Bert Hopkins was brought to the hospital, where I treated him. He was unconscious. He had wounds on his head, face, one hand, and an abrasion over the left hip. He was in a state of shock and both the pupils of his eyes were dilated. As he came out of his unconscious condition I could ascertain that he had suffered a concussion of the brain. He remained unconscious about 48 hours. He remained in the hospital fourteen days, and was removed to Pine Bluff. After he got better I found more trouble—a sprain of the curvical vertebra; also a sprain of the left pelvic region and left thigh. I took an X-ray and found a fracture of the skull, but no fracture of the curvical vertebra. He also was unable to use his left shoulder and left arm, and had no use of his left lower limb. He

could move them, however. I attributed this condition to his brain injury. I would say that he had a very severe concussion and his nervous system torn up. . . . I did not bring the X-ray pictures with me. As long as he stayed in the hospital he got better. I cannot testify that the plaintiff is permanently injured. There are two layers of the skull, the outer and the inner. It was the outer layer that was fractured, but I cannot tell from the X-ray whether the inner skull was injured. The patient is liable to have headaches and eye trouble. When the brain tissue is damaged it is never replaced. The X-ray sometimes will show a blood clot and sometimes it will not. I could not see a blood clot on the X-ray in this case. The probable or possible condition that I testified about in this case may exist, and then it may not happen.''

Dr. J. B. Jameson testified: ''I examined Bert Hopkins August 16, 1937. From that examination I found he was fairly well nourished, blood pressure normal, pulse rate slightly increased with almost a degree of temperature. He had two or three scars on his forehead; one on his chin, and a long scar in his left eyebrow. His right leg is somewhat smaller than the left one. He had fairly good use of the joints of his body. He had a loss of sensation around the waist. He had an area of [diminished sensation] around his body; also along the anterior surface of the front of his leg. This indicated that some nerve changes have taken place from the spinal cord. The X-ray showed that he had a fracture of the skull with some depression of bone on the inner place of the skull. Evidently he had trouble affecting his spinal cord which did not show up in the X-ray. I could not say whether the injury of the spinal cord was due to the brain injury or an injury lower down in the cord. I concluded from my findings that he had some disturbance of the cord and nerves. . . . From the symptoms I found I would expect him to have headaches and some disturbance in his equilibrium. He would also have pains along the course of the nerves that are involved and the condition might affect his ability to

sleep. I believe he would have pains in his head and extremities more times than he would not have pain. The damage that has been is permanent, and I think his condition will be progressive to a certain point, and will then become stationary. He will not have any more paralysis than he has now. He is unable to perform any kind of work or labor, and in my opinion his present condition will continue for the balance of his life. . . . The indentation on the brain could have been relieved by an operation. . . . I am inclined to think that his condition is due to some condition in the spinal cord, but it cannot be demonstrated with an X-ray. . . . After the damage has been done, as it now has, it could not be relieved in any way.''

Dr. S. A. Thompson testified substantially as did Dr. Drennan.

Appellants call attention to the testimony of appellee's four witnesses (other than appellee), all of whom testified negatively as to signals—that is, they did not hear the bell or whistle. It is urged on behalf of appellant that the substance of such testimony is that the witnesses did not know whether the signals were, or were not, given. Appellee testified that the signals were not given. This testimony is contradicted by witnesses for appellants who were not connected in any way with the case, and who are referred to as disinterested witnesses. They testified that the bell was being rung and that the whistle was being blown.

Errors in instructions, and erroneous rulings of the trial court, are urged as grounds for reversal. However, a majority of the judges hold that there was substantial testimony for consideration of the jury; that exceptions argued either do not show error; or, if error was committed, it was not prejudicial. It follows, therefore, that the judgment must be affirmed.

The writer and Mr. Justice FRANK G. SMITH do not agree with the majority, but are of the opinion that the negligence of appellee was greater than that of appellants, and that there is no liability.

Affirmed.